# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| M. D., | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | **Case No.:  2:03-CV-2169-RDP** |
| | } | |
| THE CITY OF HOMEWOOD, | } | |
| ALABAMA, et al., | } | |
| | } | |
| **Defendants.** | } | |
| ------------------------------------------------- | } | |
| M. S., | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| | } | **Case No.:  2:03-CV-2204-RDP** |
| v. | } | |
| | } | |
| THE CITY OF HOMEWOOD, | } | |
| ALABAMA, et al., | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

## I.      INTRODUCTION

This consolidated litigation, filed by two minor plaintiffs who have now reached the age of majority, involves civil rights and state law claims against the City of Homewood ("City") and various law enforcement officers of the Homewood Police Department.  The court has before it the Motion for Summary Judgment (Doc. #79) filed in 2:03-CV-2169-RDP on February 7, 2005, on behalf of Defendant Kathy Henderson ("Henderson"), a Homewood police officer, and the Motion for Summary Judgment (Doc. #96) filed in 2:03-CV-2169-RDP on May 9, 2005, on behalf of the other defendants in this case:  the City; Charles Trucks ("Trucks"), Chief of  Police; Paul Costas ("Costas"), Deputy Chief of Police; Rodney Stafford ("Stafford"), a Homewood police officer; and

Scott Crafton ("Crafton"), another Homewood police officer.  The court also has before it the Motion for Summary Judgment filed in 2:03-CV-2204-RDP on May 9, 2005, on behalf of the City, Trucks, Costas, Stafford, and Crafton.  (Doc. #24).  Plaintiffs filed their oppositions to the pending motions (Doc. #98; Doc. #99) on May 19, 2005, and refiled in part on June 13, 2005, pursuant to the court's Order of June 6, 2005.[1]  In accordance with the court's briefing Order, all Defendants filed their reply briefs (Doc. #120; Doc. #121) on June 20, 2005.  The court held a hearing and heard oral argument from the parties on June 29, 2005.  At the court's request, the parties supplemented their summary judgment materials on July 6, 2005.  (Docs. #124 - #126).  On August 11, 2005, Defendant Henderson filed a short letter which addressed certain statutory authority she wished to bring to the court's attention.  (Doc. #128).

As discussed in detail below, the court is persuaded that Defendants have carried their burden on summary judgment of demonstrating that there are no material facts in dispute and that they are entitled to judgment as a matter of law on Plaintiffs' federal claims.  The court, in its discretion, chooses not to retain jurisdiction over Plaintiffs' state law claims, and those claims will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## II.   THE PARTIES AND THEIR PLEADINGS

This litigation was commenced on August 7, 2003, when Plaintiffs filed their initial lawsuits against the City, Defendant Trucks in his individual and official capacity, Defendant Costas in his individual and official capacity, and Defendant Henderson in her individual and official capacity.

---

[1]The court required Plaintiffs to refile certain sections of their opposition briefs in order to comply with Exhibit A to the court's scheduling order.  Defendants were similarly ordered to refile their reply briefs in order to respond to Plaintiffs' new opposition briefs.

AF No. 1.[2]  The individual cases were later consolidated by an order of the court entered on October 6, 2003.  (Doc. #19).  Plaintiffs assert the following claims against Defendants:  violation of Plaintiffs' Fourth Amendment rights alleging unlawful detention (Count I), unlawful search (Count II), and excessive force (Count III); violation of the Plaintiffs' Fourteenth Amendment rights alleging denial of due process (Count IV); non-feasance for failure to interfere (Count V); false imprisonment (Count VI); negligence for inadequate training and supervision (Count VII); negligent infliction of emotional distress (Count VIII); and outrage (Count IX).  AF No. 2.

On February 3, 2004, Plaintiffs amended their Complaint to add Homewood police officers Rett Tyler ("Tyler"), Rodney Stafford ("Stafford"), and Scott Crafton ("Crafton") in their individual and official capacities as Defendants in this lawsuit.  AF No. 3.  On June 21, 2004, Plaintiffs again amended their Complaint to add a spoliation of evidence claim against the Defendants.  AF No. 4; AF No. 55.2.  The court previously granted Plaintiffs' Motion to Dismiss Defendant Rett Tyler on December 15, 2004.  (Doc. #75).

## III.   STATEMENT OF FACTS

In the early morning hours of November 9, 2001, Plaintiffs were visiting friends in the Homewood area and had gone to the Waffle House to eat.  AF No. 22.1.  At the time both girls were sixteen years old, and Plaintiff M.D. was visiting from Chicago.  AF No. 22.2.  After dropping off

---

[2]The designation "AF" stands for admitted fact and indicates a fact offered by Defendants that Plaintiffs have admitted in their written opposition to summary judgment, in their deposition testimony, or by virtue of any other evidence offered in support of their case.  Whenever Plaintiffs have adequately disputed a fact offered by Defendants, the court has accepted Plaintiffs' version. The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of Defendants' Statement of Facts.  A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, AF No. 55.2 would indicate the second sentence of paragraph 55 of Defendants' Statement of Facts is the subject of the court's citation to the record.

a friend, Plaintiffs passed a Homewood police vehicle traveling in the opposite direction. AF No. 23.

Defendant Henderson was on duty that night and received information from the police dispatch officer to be on the lookout for an individual or individuals in the Homewood area suspected of spray painting D.A.R.E. vehicles belonging to the Homewood Police Department.[3] AF No. 5; AF No. 41.2. While on patrol, Defendant Henderson observed Plaintiff M.S. traveling on Oak Grove Road, which is located in Homewood. AF No. 7.1. Plaintiff M.S. was driving a red 2001 BMW 325 CI bearing a tag number registered in the name of William A. Short, Jr. ("Short"), her father. AF No. 25; (Doc. #115 at Ex. C at 35); (Doc. #116 at Ex. I at narrative description). Plaintiff M.D. was a passenger in the BMW.

Although Henderson testified in her deposition that Plaintiff M.S. committed certain traffic violations, Plaintiffs deny that. AF No. 7.2. Rather, it is Plaintiffs' position that Henderson stopped them to investigate whether they were involved in (or aware of) the spray painting of the City's police vehicles.[4] Indeed, it is undisputed that Defendant Henderson saw the car and decided to follow behind it and check the tag. AF No. 42. Defendant Henderson thought that it was odd for a car with such a tag to be coming out of the Oak Grove area (i.e., the area in Homewood near where

---

[3]The court recognizes that Plaintiffs argue that when they were observed driving in Homewood, the paint on the police vehicles was already dry. However, Plaintiffs' assertion does not suggest that the police were not still operating under a valid BOLO order.

[4]The Eleventh Circuit has made it abundantly clear that "[w]hen the nonmovant has testified to events, we do not (as urged by Plaintiffs' counsel) pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant." *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005)(en banc) (footnote omitted). Therefore, the court will adopt the Plaintiffs' assertions–that Henderson stopped them in connection with the BOLO order referenced above.

4

the vandalism occurred), and stated on the dispatch tape that she wanted to see "who's in it."  AF No. 7.3; AF No. 43.  The information received by Defendant Henderson indicated that Short's car was registered at a Bessemer address.  *Id*. Defendant Henderson's reason for pulling Plaintiffs over was that she thought the girls had spray painted vehicles: "We have possibly got folks on the ground."  AF No. 9.

Defendant Henderson pulled Plaintiffs over, approached the driver, Plaintiff M.S., asked to see her license, and also asked for Plaintiff M.D.'s license.  AF No. 8.1; AF No. 45.  During their initial interaction, Defendant Henderson detected the smell of alcohol emanating from the vehicle. AF No. 8.2.[5]  Plaintiff M.D. was a passenger in Plaintiff M.S.'s vehicle at the time in question.  AF No. 8.3.  At the time Plaintiff M.S. was questioned by Henderson at the scene, she denied that she had been drinking.  However, in her deposition, she admitted to drinking "[a]bout four beers" in a "three-hour time period" that night.  (Doc. #115 at Ex. C at 71, 49-50).  Plaintiff M.D. candidly admitted to Henderson at the time of the stop that she had been drinking alcohol.  AF No. 13.

Defendant Henderson conducted a search of the BMW and its contents and found the following items: four remaining beer cans from a Bud Light twelve-pack box in the trunk of the car;

---

[5]While Plaintiffs indicate that they dispute this particular fact, Plaintiff M.S. testified during her deposition that she recalls Defendant Henderson's stating to them (after asking for Plaintiff M.S.'s license) that "[they] had been drinking, she smelled alcohol" and later asking them "if [they] knew anything about a D.A.R.E. cop car being spray painted." (Doc. #115 at Ex. C at 64).  Plaintiff M.S. also admits that Henderson told her she could smell alcohol on her (M.S.) at the time of the stop.  (*Id*. at 136-37).  As acknowledged by counsel during the hearing, and already noted above, Plaintiffs cannot pick and choose between their own version and Defendants' version of facts, depending upon which they believe is more favorable to their litigation position. *See Evans*,  407 F.3d at 1278.  Moreover, the difference between "observed the smell of alcohol" (Doc. #113 at Ex. A at 121) and "smelled alcohol emanating" (AF No. 8.2) is not significant enough to create a material factual dispute.  Accordingly, the court deems this fact admitted by Plaintiffs as it is consistent with the deposition testimony of Plaintiff M.S. and Defendant Henderson.

a book bag belonging to Plaintiff M.S., which contained several unopened packs and a partial pack

of Camel Light cigarettes; and a purse belonging to Plaintiff M.S. containing drug paraphernalia –

a marijuana pipe.  AF No. 11; (Doc. #115 at Ex. C at 84-85, 87-88, 89, 92).  Plaintiffs dispute that

the search conducted by Defendant Henderson was an inventory one and state that she never

obtained consent to search the car.  AF No. 47.  After Defendant Henderson searched the BMW, she

radioed the Homewood Police Department headquarters and arranged for another officer, Tyler, to

come to the scene with a portable breathalyzer.  AF No. 10.  At some point in time, Defendant

Henderson conducted a pat-down search of Plaintiff M.S. and placed her in the back seat of the

patrol car.  AF No. 12.  Defendant Henderson also patted down Plaintiff M.D. and placed her in the

back seat of the patrol car.  AF No. 13; (Doc. #115 at Ex. C at 112).  Upon Tyler's arrival, Defendant

Henderson administered the field intoxilyzer to both Plaintiffs M.S. and M.D.[6]  AF No. 14; AF No.

28.  Documentation of the tests of Plaintiff M.D. were not made part of the record.  AF No. 49.1.

  Two versions of an Alabama Uniform Traffic Ticket and Complaint for Plaintiff M.S. exist:

one cites Plaintiff M.S. for driving under the influence of alcohol and the other cites her for driving

under the combined influence of alcohol and a controlled substance.  AF No. 15.1; (Doc. #116 at Ex.

E); AF No. 54.[7]  Both front pages of the Alabama Uniform Arrest Report for Plaintiff M.S. filed by

---

[6]The only documentation of an intoxilyzer test for either plaintiff is from the test
administered to M.S. at the Homewood Police Department.  AF No. 49.2; (Doc. #116 at Ex. M).
This test reflects a recording of 0.0 at 4:04:25 a.m. on November 9, 2001.  AF 49.3; (Doc. #116 at
Ex. M).  Plaintiff M.S. recalls Defendant Henderson telling her at the scene of the stop that she blew
a .01 %.  (Doc #111 at C at 99).  Defendant Henderson stated in the Alabama Uniform Arrest Report
for Plaintiff M.S. that she blew a .048 % (Doc. #116 at Ex. I at narrative description), and indicated
during her deposition that Plaintiff M.S. blew .04 %.

[7]Plaintiffs use the word "altered" in describing the Alabama Uniform Traffic Ticket and
Complaint for Plaintiff M.S., but do not identify which parts of the document were altered or who
altered it.  Plaintiffs' Statement of Fact No. 54.

Plaintiffs reflect that she was charged with (and booked for) the following four misdemeanor offenses: D.U.I.; minor in possession of alcohol;  possession of drug paraphernalia; and minor in possession of tobacco.  (Doc. #116 at Ex. I); AF No. 31.2.; AF No. 55.[8]  Plaintiff M.D. was not charged with a crime.[9]  AF No.15.3

Plaintiffs M.D. and M.S. were transported in the back of Defendant Henderson's patrol car to the Homewood City Jail and placed in cells there.  AF No. 16.1; AF No. 19.1; AF No. 30. Plaintiff M.D. was subsequently released to the care of her father hours later.[10]  AF No. 16.2.  While at the jail, Defendant Henderson performed a limited strip search of Plaintiff M.S. in a maintenance closet at the Homewood Police Station.  AF No. 17.1; AF No. 51.  Plaintiff M.S. was not required to remove her bra and underwear during the search of her person.  AF No. 18.  Plaintiff M.D. was subjected to the same type of search.  AF No. 51.

With respect to the underlying criminal charges, Plaintiff M.S. entered into a consent decree related to the minor in possession charge and all charges were subsequently dismissed.  AF No. 20. As part of the consent decree, Plaintiff M.S. served probation, underwent drug testing, and

---

[8]Plaintiffs use the word "altered" in describing the Alabama Uniform Arrest Report for Plaintiff M.S., but do not identify which parts of the document were altered or who altered it. Plaintiffs' Statement of Fact No. 55.  One obvious difference is that one version of the Alabama Uniform Arrest Report includes a second page containing a narrative description by Defendant Henderson while the other does not.

[9]Plaintiff M.D. stated during her deposition that at the scene, she felt as if she was being paraded in front of the other officers.  AF No. 29.2.  Defendant Henderson told Plaintiffs that "Pete [Plaintiff M.S.'s father] is going to lose his business" and tried to get information from them about the D.A.R.E. cars.  AF No. 50.1.  Indeed, Defendant Henderson later told Plaintiff M.D.'s father, "In all honesty, I never would have brought M.S. to jail if they had given up who all spray painted the cars."  AF No. 50.2.

[10]There is no record documentation showing that Plaintiff M.D. was ever at the jail.  AF No. 52.

performed community service.  AF No. 21.

In addition to the different versions of the police reports and non-existent intoxilyzer test results referenced above, Plaintiffs have pointed to various irregularities related to other records and tapes produced (or not produced) by Defendants.  If an officer is in a vehicle without a camera or an inoperable camera, policy provides that fact is to be noted prior to beginning patrol pursuant to general order 0099; however, no such documentation was provided in this case.  AF No. 34.2; AF No. 35.  For example, the video from the jail was never produced.  AF No. 36.  Similarly, no video from Henderson's stop of Plaintiffs has been produced.  Although the litigation log regarding videos was produced, Defendant's expert, Captain Beggs, has opined that the log appeared to have been altered.  AF No. 37.  The dispatch tapes produced are inconsistent, and significant and pertinent portions have been deleted from some of the versions.[11]  AF No. 55.1.

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R .Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

---

[11]The court is keenly aware and troubled about this so-called "missing evidence."  However, in light of the proper legal framework that must be applied to the claims asserted by Plaintiffs – i.e., the standards for qualified immunity and municipal liability – these matters do not alter the analysis of Plaintiffs' federal claims or the necessary outcome of that analysis.

V.      DISCUSSION

A.      *Heck v. Humphrey*

As an initial matter, Defendant Henderson argues that the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994) bars Plaintiff M.S.'s claims. This assertion is based on the fact that Plaintiff M.S. entered into a criminal consent agreement with respect to one of the charges made against her. Henderson argues that agreement is akin to a criminal conviction such that any § 1983 litigation amounts to an impermissible collateral attack. The argument is off the mark for the tautological reason that M.S. was never convicted of anything.

The record relating to Plaintiff M.S.'s criminal case does not reflect that she ever entered a guilty plea. Nor was there ever any adjudication of her guilt. Rather, the docket sheet reflects that her case was "suspended" pending her completion of a probationary period, drug-testing, and community service. The court finds *Heck* is inapplicable and does not apply to her claims brought under § 1983.[12] At most, the prosecutor agreed to dismiss the remaining charge against her in return for her successful completion of the requirements listed above.

B.      Qualified Immunity

The individual defendants all assert they are entitled to qualified immunity. Thus, the court is required to examine this unique area of the law.

        1.      General Principles

Qualified immunity is a defense available to police officers (as well as other state actors) and is designed to greatly limit litigation against such persons in their individual capacities. Indeed, the

---

[12]Plaintiff M.D. was never charged with any offense, and was never a party to a criminal consent agreement. Accordingly, *Heck* has no applicability to her claims whatsoever.

defense is so broad that only those officers who are "plainly incompetent and those who knowingly violate the law" are required to defend against individual liability claims. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The purpose of qualified immunity is, "to ensure that before they are subjected to suit, [police] officers are on notice [that] their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206 (2001).

For individual defendants, qualified immunity utilizes an "objective reasonableness standard, giving a government agent the benefit of the doubt unless [his] actions were so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed them." *GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359, 1366 (11th Cir. 1998). As the Eleventh Circuit has recently stated, "the salient question . . . is whether the state of the law [at the time of the events in question] gave [the officers] fair warning that [her] alleged treatment of [the plaintiffs] was unconstitutional." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1278 (11th Cir. 2004) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *see also Gray v. Bostic*, No. 04-12240 (Doc. #105 at supplement at 8-9) (11th Cir. Dec. 27, 2004) ("The United States Supreme Court has established a two-part test to determine the applicability of qualified immunity. The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a violation. If under the plaintiff's allegations, the defendants would have violated a constitutional right, the next, sequential step is to ask whether the right was clearly established.'") (internal and other citations omitted).[13] Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish"

---

[13]The Eleventh Circuit's decision in *Bostic*, which Plaintiffs contend is persuasive authority, is referenced in a "Table of Decisions Without Reported Opinions" within the Federal Reporter. As an unpublished opinion, it is not treated as binding precedent. 127 Fed. Appx. 472 (11th Cir. 2004).

the law in this circuit.  *Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003).

Once a defendant has raised the defense of qualified immunity and has shown that his or her actions were within the scope of discretionary authority, then the plaintiff has the burden to overcome the defense.  More specifically, the Eleventh Circuit recognizes the following two-part analysis for qualified immunity claims:[14]

> 1.  The defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."
>
> 2.  Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part.  This burden is met by proof demonstrating that the defendant public official's actions "violated clearly established constitutional law."

*Rich v. Dollar*, 841 F.2d 1558, 1563-64 (11th Cir. 1988) (quoting *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983)) (other citations omitted).  Furthermore, there is a temporal requirement related to this inquiry.  A plaintiff must show that a reasonable public officer would not have believed her actions to be lawful in light of law that was clearly established *at the time* of the purported violation. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Johnson v. Clifton*, 74 F.3d 1087, 1091 (11th Cir. 1996).

### 2.    Specific Application

In order to determine whether the defense of qualified immunity applies to any of the individual defendants, the court must first examine the specific claims Plaintiffs have made against

---

[14]Plaintiffs do not challenge whether any of the law enforcement defendants were acting outside of their discretionary authority.  Therefore, the court's qualified immunity analysis focuses on the second part of the test, which is Plaintiffs' burden to carry.

them.[15]   In their Complaint, Plaintiffs have asserted the following claims against the individual defendants:  Count I - unlawful detention; Count II - unreasonable search; Count III - excessive force; Count IV - denial of due process;[16] Count V - nonfeasance – failure to interfere; and Count VI - false imprisonment.  Counts I, II, III, and IV assert federal claims against the non-municipal (i.e., individual) defendants in their individual capacities.  The court addresses these claims below.[17]

_____

[15]Count VII is for negligence – inadequate training and supervision.  As confirmed by Plaintiffs during the hearing, to the extent that this count is intended to be a federal claim, it is asserted against the City pursuant to § 1983 and does not involve any of the individual defendants; therefore, the court need not address whether qualified immunity shields the individual defendants from the claim in Count IV.  In addition, the following counts are based upon Alabama state law, and therefore do not come into play under the court's qualified immunity analysis:  Count VIII (negligent infliction of emotional distress); Count IX (tort of outrage); and Count X (spoliation).

[16]During the hearing, Plaintiffs indicated that Count IV of the Complaint, related to Plaintiffs' being held without due process of law, is different than the theory of liability stated in the Complaint relating to the creation of a hostile environment at the Homewood City Jail.  (Doc. #24 ¶ 28).  To the extent Plaintiffs were unconstitutionally held in violation of their due process rights, such a theory is subsumed by Plaintiffs' Fourth Amendment search and seizure claims.  The unconstitutional hostile environment theory was not pursued by Plaintiffs in their briefs on summary judgment or during the hearing.  Therefore, Plaintiffs have abandoned it as an independent basis for recovery.  *See, e.g., Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller International, Inc.,* 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *see also Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995); *Hudson v. Norfolk Southern Ry. Co.,* 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001).  *Cf. McMaster v. United States,* 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment.").

[17]Count VI for false imprisonment is based upon Plaintiffs' being held in the "car without probable cause or justification" and then subsequently confined to an "adult jail cell."  (Doc. #24 ¶¶ 34-35).  Similar to Plaintiffs' due process count, these facts are akin to and therefore the claim is subsumed by Plaintiffs' Fourth Amendment search and seizure claims.  Alternatively, Plaintiffs have

a.        **Defendant Henderson's Claim of Qualified Immunity**

i.        **Initial Traffic Stop**

If Plaintiffs admitted that Plaintiff M.S. committed a traffic violation, Henderson's traffic stop would be plainly permissible because the Eleventh Circuit has held that "a police officer may stop a vehicle when there is probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles." *United States v. Strickland*, 902 F.2d 937, 940 (11th Cir. 1990).[18]  However, here, the

---

abandoned it as a separate theory as they did not address it as an independent constitutional claim in their briefs on summary judgment or during the hearing.

[18]For example, as recently noted in *United States v. Couch*, No. 03-172-N, 2004 WL 419903, at *2 (M.D. Ala. Feb. 5, 2004), "police officers can constitutionally pull over a vehicle when they have probable cause to believe that the car is speeding, *see, e.g., Riley v City of Montgomery*, 104 F.3d 1247, 1252-53 (11th Cir. 1997), probable cause to believe the car ran a stop sign, *see, e.g., United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999), or probable cause to believe the vehicle had illegally altered tags or expired tags, *see, e.g.*, *United States v. Long*, 320 F.3d 795, 798 (8th Cir. 2003)."  As the court further observed in *Couch*:

> [A]s long as a police officer has probable cause to believe that a traffic violation has occurred, any other reason the officer might have in his mind for the stop is irrelevant.  In the Eleventh Circuit's words, "the constitutional 'reasonableness' of a traffic stop is determined irrespective of 'intent,' either of the individual officer involved or any theoretical 'reasonable officer' . . . .  The only question is whether the suspect's behavior gave rise to the probable cause sufficient to justify the seizure."

*Id.* at *2 (citations omitted); *see also Whren v. United States*, 517 U.S. 806, 812 (1996) (providing that officer's motive in making traffic stop does not invalidate what is otherwise "objectively justifiable behavior under the Fourth Amendment"); *United States v. Strickland*, 902 F.2d 937, 940 (11th Cir. 1990) ("[A] police officer may stop a vehicle '[w]hen there is . . . probable cause to believe that a driver is violating any one of a multitude of applicable traffic and equipment regulations' relating to the operation of motor vehicles.") (quoting *Delaware v. Prouse*, 440 U.S. 648, 655-57 (1979)); *see also Whren*, 517 U.S. at 810 (stating that police decision to stop automobile is reasonable when probable cause for occurrence of traffic violation exists); *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002) (describing probable cause standard in context of arrest for minor traffic violation and stating that "arrest must be objectively reasonable based on the totality of the

Plaintiffs' version of the facts – which the court, in assessing qualified immunity, must treat as stipulated facts – is that no traffic violation occurred and, therefore, Henderson had no probable cause to believe such a violation took place. *See Evans v. Stephens*, 407 F.3d at 1277 ("We do not make credibility determinations, but instead believe the 'evidence of the non-movant . . . and all justifiable inferences are to be drawn in his favor.'") (citations omitted). But the acceptance (for purposes of this motion) of Plaintiffs' version of the facts does not end the court's inquiry. A police officer may also conduct an investigatory traffic stop, and such a stop involves a lesser constitutional standard than probable cause that a traffic violation has occurred. *See United States v. Powell*, 222 F.3d 913, 916-17 (11th Cir. 2000). In *Powell*, the plaintiff argued unsuccessfully in a criminal case that the objective facts, including evidence that she had not violated any traffic laws, made the officers' investigatory stop of her unconstitutional. *Id.* at 916. The Eleventh Circuit rejected that argument and stated:

> Under *Terry v. Ohio*, 392 U.S. 1 (1968), in evaluating the constitutionality of an investigatory stop, the court must examine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 20, 88 S. Ct. at 1879. Under *Terry*, law enforcement officers may detain a person briefly for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity. The "reasonable suspicion" must be more than an "inchoate and unparticularized suspicion or hunch." The officer must have "some minimal level of objective justification" taken from the totality of the circumstances.

*Powell*, 222 F.3d at 917 (parallel references, internal and other citations omitted). In upholding the constitutionality of the *Terry* stop in *Powell*, the Eleventh Circuit drew from the Supreme Court's decision in *Illinois v. Wardlow*, 528 U.S. 119 (2000). There, the Supreme Court explained that

circumstances").

14

evaluation of the reasonable articulable suspicion standard requires a common sense approach:

> In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.

*Wardlow*, 528 U.S. at 124-25 (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)). Therefore, the key question is whether, under the facts in the light most favorable to Plaintiffs, Defendant Henderson had a reasonable articulable suspicion to stop Plaintiffs.

The court concludes that, even based on Plaintiffs' version of the facts, the lesser constitutional standard of reasonable articulable suspicion existed for Defendant Henderson to make a *Terry* stop. Plaintiffs were two sixteen year old girls driving in the early morning hours in Homewood soon after the spray-painting of D.A.R.E. Homewood police cars had taken place. They were driving in a BMW that had a tag registered outside of the jurisdiction when the police were conducting a search for persons who may have been involved in the spray-painting incident. The police were on the look-out for young people (possibly Vestavia Hills High School students, some of whom drive upper-end vehicles, such as BMWs) in the Homewood area. In light of these facts, the court is persuaded that Defendant Henderson did not act unconstitutionally by stopping Plaintiffs for investigatory purposes. More specifically, the court finds, under the totality of the circumstances, that a minimal level of objective justification for the stop existed, thereby making the stop constitutional. *Powell*, 222 F.3d at 917.

Alternatively, the court finds that even if Defendant Henderson lacked a reasonable suspicion to stop Plaintiffs, she is still entitled to prevail on her qualified immunity defense. This is the case because, at minimum, she had "arguable" reasonable suspicion to make the stop. *See Williamson*

*v. Mills*, 65 F.3d 155, 157 (11th Cir. 1995) (holding that when an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had arguable reasonable suspicion to support an investigatory stop); *Swint v. The City of Wadley, Alabama*, 51 F.3d 988, 996 (11th Cir. 1995); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1558 (11th Cir. 1993). Consistent with this holding, the court finds Plaintiffs have not carried their burden of demonstrating that Henderson's actions violated clearly established law. The court has not been able to locate nor have the parties pointed to (1) any clearly established case law or (2) anything else that would have given a reasonable police officer in Defendant Henderson's position, on the night in question, fair and clear warning that her stop of the BMW violated Plaintiffs' constitutional rights. *See, e.g., Holloman*, 370 F.3d at 1278. As such, qualified immunity protects Defendant Henderson from any individual liability relating to the initial stop of Plaintiffs.

### ii.    Subsequent Detention and Searches

Henderson also asserts that the qualified immunity defense operates to bar Plaintiffs' other Fourth Amendment claims against her, including: the search of the BMW and Plaintiff M.S.'s purse; the pat-down searches; the detention of Plaintiffs at the City of Homewood Jail; and the limited strip searches of Plaintiffs (which the court will address in a separate subsection).[19]

Beginning with Plaintiffs' claim of unlawful search, the court concludes that Henderson cannot be held individually liable for the search of the car or Plaintiff M.S.'s purse or book bag. The

---

[19]Plaintiffs' Complaint also contains allegations about Defendant Henderson's failure to give them a *Miranda* or a super-*Miranda* warning given their status as minors. However, at the hearing, the court pointed out that neither of the plaintiffs was ever convicted of any crime, none of their statements were used against them, and M.S.'s father, who is a lawyer, was contacted after she was taken to the jail. In short, there were no adverse consequences relating to the lack of any such warning. Accordingly, in this area, Plaintiffs cannot establish any violation of their rights, much less a violation which caused them any harm.

Eleventh Circuit has consistently held that once an officer has briefly stopped a motor vehicle operator within the confines of constitutional law, the officer's continuing detention of the vehicle's occupants is authorized under the Fourth Amendment if the officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *See United States v. Griffin*, 109 F. 3d 706, 707 (11th Cir. 1997) (per curiam) (citing *United States v. Tapia*, 912 F. 2d 1367, 1370 (11th Cir. 1990)); *United States v. Purcell*, 236 F. 3d 1274 (11th Cir. 2001).[20]   The court concludes that Henderson had, at a minimum, arguable probable cause[21] to conduct the search.   Thus, even if Plaintiffs are correct and Henderson lacked actual probable cause, "officers who make an arrest without probable cause are still 'entitled to qualified immunity if there was arguable probable cause for the arrest.'" *Durruthy v. Pastor*, 351 F.3d 1080, 1089 (11th Cir. 2003) quoting *Jones v. Cannon*, 174 F.3d 1271, 1283 (11th Cir. 1999) (citing

---

[20]Also, to the extent that Plaintiffs argue that the unlawfulness of the initial stop somehow taints the further detention and search of Plaintiffs such that qualified immunity cannot apply to any of Defendant Henderson's later actions, that argument is without merit. Even if Defendant Henderson acted unconstitutionally when she first stopped Plaintiffs (which the court has determined she did not), as stated earlier, at a minimum, the illegality of the initial traffic stop was not obvious under clearly established law.  Accordingly, even if there was some "taint" related to the initial traffic stop (as Plaintiffs argue), that does not in itself deprive Defendant Henderson of qualified immunity.

[21]As the Eleventh Circuit has noted in addressing qualified immunity, "the issue is not whether probable cause existed, but instead whether there was arguable probable cause.  Qualified immunity applies when there was arguable probable cause for an arrest even if actual probable cause did not exist." *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004) ("Arguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry.") (citing *Jones*, 174 F.3d at 1283 n.3).  "Arguable probable cause exists if, under all of the facts and circumstances, an officer reasonably could – not necessarily would – have believed that probable cause was present." *Crosby*, 394 F.3d at 1332; *Montoute*, 114 F.3d at 184 ("In order to be entitled to qualified immunity from a Fourth Amendment claim, an officer need not have actual probable cause but only 'arguable probable cause,' i.e., the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed.").

*Lindsey v. Storey*, 936 F.2d 554, 562 (11th Cir. 1991)).  Arguable probable cause exists when "an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997); *see also Jones*, 174 F.3d at 1283.  In determining whether arguable probable cause exists, this court must "apply an objective standard, asking 'whether the officer's actions are objectively reasonable ... regardless of the officer's underlying intent or motivation.'" *Vaughn v. Cox*, 264 F.3d 1027, 1036 (11th Cir. 2001) (quoting *Montoute*, 114 F.3d at 184).  Thus, '[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citation omitted).

After her initial stop of Plaintiffs to investigate their possible involvement in the spray-painting incident, and upon smelling alcohol emanating from M.S. who was driving a car occupied by another sixteen year old, M.D., admitted she had been drinking.  Without question, Henderson had at least arguable probable cause (if not more) of criminal activity – D.U.I. and underage drinking.  When Henderson detected what she knew from her law enforcement experience to be the odor of alcohol coming from the driver, M.S., that discovery warranted further detention and questioning of Plaintiffs.  While Plaintiffs argue that their detention from this point on was unconstitutional, that assertion is misplaced.  The Supreme Court has "long held that the 'touchstone of the Fourth Amendment is reasonableness.'" *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)); *see Commonwealth of Pennsylvania v. Mimms*, 434 U.S. 106 (1977).  Reasonableness is measured by examining the totality of the circumstances. *Robinette*, 519 U.S. at 39.

18

According to Plaintiffs' version of the events, which the court must accept as true for purposes of these motions, Defendant Henderson searched Plaintiff M.S.'s car without obtaining proper consent.  In *U.S. v. Alexander*, 835 F.2d 1406, 1408-09 (11th Cir. 1988), the Eleventh Circuit addressed the constitutionality of conducting a warrantless search of an automobile when consent to search the vehicle had been withdrawn.  Drawing from *California v. Carney*, 471 U.S. 386 (1985) and other cases, the Eleventh Circuit stated:

> The basic premise of search and seizure doctrine is that searches undertaken without a warrant issued upon probable cause are "per se unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions." One of the well-established exceptions encompasses searches and seizures of automobiles. Government officers may conduct a warrantless search or seizure of a vehicle if (1) there is probable cause to believe that the vehicle contains contraband or other evidence which is subject to seizure under law, and (2) exigent circumstances necessitate a search or seizure. The traditional rationale for this exception to the warrant requirement was that automobiles could be quickly moved out of the jurisdiction, thereby thwarting law enforcement efforts. This justification retains validity in the modern cases.

*Alexander*, 835 F.2d at 1408-09 (internal and other citations omitted).  Describing the test appropriate for a warrantless search of a car, the *Alexander* court further noted:

> The recent cases also emphasize that less rigorous warrant requirements govern searches of automobiles because people have a lesser expectation of privacy with respect to their automobiles. In *Carney*, the Supreme Court explained that the pervasive scheme of government regulation of motor vehicles necessarily leads to reduced expectations of privacy in a vehicle, as opposed to a home or office. The Supreme Court has emphasized, however, that before a warrantless search is justified, the "overriding standard of probable cause" must be satisfied.

*Id.* at 1409 (internal and other citations omitted).  The *Alexander* court described that probable cause to search a car exists:

> [W]hen the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband [or other evidence subject to seizure]. In determining when reasonable cause exists to believe that a vehicle contains

contraband, the Court examines the totality of the circumstances and the inferences that flow therefrom.

*Id.* at 1409 (internal and other citations omitted).

The totality of the circumstances here suggests that Defendant Henderson had at least arguable probable cause to search the BMW. It was early in the morning of November 9, 2001, when Plaintiffs were initially stopped by Defendant Henderson. Plaintiffs were minor girls driving after midnight in Homewood in a BMW that had a tag registered outside of the jurisdiction. The police were on the lookout for persons (who were possibly students at Vestavia Hills High School) suspected of spray painting city police cars. Under Plaintiffs' version of the facts, Plaintiff M.D. admitted to Defendant Henderson that she had been drinking. As Plaintiff M.S. has testified, at the scene she told Defendant Henderson she (M.S.) had not been drinking; however, in her deposition, she estimated that she had imbibed "about four beers" earlier that evening. Plaintiff M.S. also confirmed in her deposition that she recalls Defendant Henderson telling her that as she approached her she could smell alcohol. (Doc. #115 at Ex. C at 136-37). Moreover, Defendant Henderson was aware before searching the car that Plaintiffs had been to the Waffle House (a customary after-party gathering spot) earlier in the night, after Plaintiff M.D. refreshed her memory about them being there with a male friend for at least part of the time in which Defendant Henderson was. (Doc. #115 at Ex. D at 24-25). This additional information that Defendant Henderson learned from Plaintiffs gave her probable cause to search the BMW for further evidence of underage drinking at a minimum[22] and

---

[22]The court disagrees with Plaintiffs that Defendant Henderson's search of the vehicle before testing Plaintiffs for their blood alcohol levels automatically renders the search unconstitutional. The court must undertake its analysis regarding probable cause based upon the totality of the circumstances and not solely upon a certain sequence of selected events. Also, to the extent that any purported expert has stated concerns about the order of events and procedures followed by Defendant Henderson, the court points out that it is ultimately the one responsible for making the probable

(at least arguably) evidence relating to the spray-painting crime as well.[23]

Having determined that arguable probable cause existed to make a warrantless search of the BMW– *i.e.*, that a reasonable police officer in the same circumstances and possessing the same knowledge as Henderson could conclude that such probable cause existed – the court must now examine whether there were exigent circumstances to justify a search of the car.  As explained in *Alexander*:

> Traditionally, the exigency involved with an automobile consisted of the fact that a "car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained." At present, however, the ability of a vehicle to become mobile is sufficient to satisfy the exigency requirement.  The vehicle does not have to be moving at the moment when the police obtain probable cause to search.

835 F.2d at 1409 (internal and other citations omitted).  Based upon that now applicable and less stringent constitutional standard, and the Eleventh Circuit's acknowledgment that only a "slight showing of exigency is required to comply with the automobile exception[,]"  the court is satisfied that exigent circumstances existed for the warrantless search. *Alexander*, 835 F.2d at 1410 n.5;  *see also Coolidge v. New Hampshire*, 403 U.S. 443, 461 n.18 (1971) ("It is frequently said that occupied automobiles stopped on the open highway may be searched without a warrant because they are 'mobile,' or 'movable.'").  Given the early hour of the morning (which was far outside of regular business hours), Plaintiffs' awareness of the situation, the ownership of the BMW belonging to a

_____

cause assessment, not an expert.

[23]While Plaintiffs denied having any knowledge about the spray painting, and a denial cannot be a basis for providing an officer with probable cause to search a vehicle, the admission by Plaintiff M.D. that she had been drinking, Plaintiffs' hanging out at the Waffle House with another friend late at night/early in the morning, and Plaintiffs' driving through a part of Homewood near where the vandalizing took place, all could lead a reasonable officer to conclude there was probable cause to believe that evidence of either underage drinking, spray paint, or both existed in the car.

person other than Plaintiffs, and the registration of the vehicle outside of the City , the opportunity to search was fleeting and the contents of the automobile might never have been found again. *Coolidge*, 403 U.S. 443, 460 (citation omitted).  As such, the burden of showing slight exigency has been met.[24]

Nor can Defendant Henderson be held liable for the pat-down searches of Plaintiffs. Defendant Henderson subsequently discovered beer in the car and a drug pipe in Plaintiff M.S.'s purse.  Therefore, it was not unreasonable under the Fourth Amendment for Defendant Henderson to conduct pat-down searches, place Plaintiff M.S. under arrest, impound the car, and take Plaintiff M.D., who was a minor who had admitted drinking alcohol, into protective custody.  With respect to the protective custody issue, from an objective standpoint, releasing Plaintiff M.S.'s car to Plaintiff M.D. to drive in the early morning hours, after her admission that she had been drinking, would have involved obvious and substantial risks.  Similar risks would be present if Defendant Henderson had left Plaintiff M.D. alone at the scene.[25]  Therefore, based upon the totality of the circumstances, the court finds that Defendant Henderson's pat-down search of Plaintiffs after they were initially stopped was constitutional.

---

[24]Consistent with the finding that Henderson had at least arguable probable cause to search the BMW and M.S.'s purse and book bag, the court finds that Plaintiffs have not satisfied their burden on qualified immunity to show that Defendant Henderson violated clearly established constitutional law and is not entitled to qualified immunity.  The court has not been able to locate nor have the parties pointed to (1) any clearly established case law or (2) anything else that would have given a police officer in Defendant Henderson's position clear and fair warning that her actions violated Plaintiffs' constitutional rights.

[25]Plaintiffs concurred at the hearing that abandoning Plaintiff M.D. at the scene would not have been reasonable under the totality of the circumstances.

Alternatively, the court concludes that, regardless of the determination as to constitutionality of Defendant Henderson's actions pursuant to the Fourth Amendment, Plaintiffs have not satisfied their burden on qualified immunity to show that Defendant Henderson violated clearly established constitutional law and is not entitled to qualified immunity.  The court has not been able to locate nor have the parties pointed to (1) any clearly established case law or (2) anything else that would have given a police officer in Defendant Henderson's position clear and fair warning that her actions violated Plaintiffs' constitutional rights.  Plaintiffs cannot make out any clearly established constitutional violation.  *See Brosseau v. Haugen*, ____ U.S. ____, 125 S.Ct. 596, 599 (2004) ("It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" (quoting *Saucier*, 533 U.S. at 201, 121 S.Ct. at 2151)).  As such, qualified immunity protects Henderson against individual liability for the subsequent actions that she took after the initial stop of Plaintiffs.

### iii.      Limited Strip Search[26]

The court also finds that Henderson cannot be held individually liable for the strip searches she conducted on Plaintiffs.  In *Justice v. Peachtree City*, 961 F.2d 188, 193 (11th Cir. 1992), the Eleventh Circuit addressed the constitutionality of a limited strip search of a juvenile female, who had been arrested for the minor offenses of loitering and truancy, the removal of her bra, but not her underwear, and held that:

---

[26]In their Complaint, Plaintiffs also assert an excessive force claim under the Eighth Amendment with respect to Defendant Henderson's limited strip search of them.  As stated at the hearing, for the purposes of the court's qualified immunity analysis, Plaintiffs agree that reliance upon the law developed under the Fourth Amendment regarding strip searches is appropriate. Plaintiffs also conceded at the hearing that they did not have an excessive force claim based upon the use of handcuffs because their version of the facts does not support it.

23

> [L]aw enforcement officers may conduct a strip search of a juvenile in custody, even
> for a minor offense, based upon reasonable suspicion to believe that the juvenile is
> concealing weapons or contraband.

In reaching its holding, the Eleventh Circuit found no reason to draw a distinction between juvenile versus adult detainees or strip searches for security versus evidentiary purposes, stating:

> A detention center, police station, or jail holding cell is a place "fraught with serious
> security dangers."  These security dangers to the institution are the same whether the
> detainee is a juvenile or an adult. The considerations regarding contraband are the
> same whether the detainee is a juvenile or an adult. Likewise, we see no reason to
> differentiate between strip searches to discover contraband to protect the security of
> the institution and strip searches within the institution which may lead to contraband
> (drugs) to be used as evidence of a crime. The level of intrusion is the same.

*Justice*, 961 F.2d at 193 (internal citation omitted).

In *Justice*, the Eleventh Circuit also described the test of reasonableness under the Fourth Amendment.  Relying upon the decision in *Bell v. Wolfish*, 441 U.S. 520 (1979), in which the Supreme Court determined that strip searches are not per se unconstitutional even when conducted with less than probable cause, the court stated:

> In order to determine the reasonableness of the search and the instances requiring less
> than probable cause, the Supreme Court set out the following test:
>
> The test of reasonableness under the Fourth Amendment is not capable of precise
> definition or mechanical application. In each case it requires a balancing of the need
> for the particular search against the invasion of personal rights that the search entails.
> Courts must consider the scope of the particular intrusion, the manner in which it is
> conducted, the justification for initiating it, and the place in which it is conducted.

*Justice*, 961 F.2d at 192.  Later in the opinion, the court examined "whether the officers in this case possessed a particularized and objective basis for suspecting [the plaintiff of] hiding contraband" and, based upon a review of the totality of the circumstances, concluded that the officers had a reasonable suspicion to justify the search.  *Id.* at 194.

24

In the more recent decision of *Evans v. Stephens*, the Eleventh Circuit dealt with the constitutionality of "an arresting officer's investigatory strip search for the purpose of discovering drugs on persons who had been arrested lawfully but had been arrested for offenses that were not drug crimes." *Evans*, 407 F.3d at 1275.   The Eleventh Circuit began its discussion with this overview:

> We mainly must decide two issues. Whether the strip searches performed on Plaintiffs violated their rights under the United States Constitution and, if so, whether that right--given the circumstances facing Officer Stephens--was already so clearly established that every objectively reasonable officer would have known that Defendant was violating federal law at the time. We conclude that the strip search here violated two rights of Plaintiffs, both arising under the Fourth Amendment. First, the strip searches--as a post-arrest criminal investigation--were unreasonable, because they were not supported by a reasonable suspicion of the existence of drug evidence. Second, even if some strip search might have been lawful, the manner in which these strip searches were performed was also unreasonable as a matter of federal law. In addition, we conclude that the right to be free altogether of a strip search was, under the circumstances, not already clearly established at the time of the incident, but that the Fourth Amendment itself provided, at the time, sufficient notice that the manner of these particular searches was "unreasonable" in the constitutional sense.

*Evans*, 407 F.3d at 1278.   Later in the opinion, the court pointed to the lack of clearly established law in the area of post-investigatory strip searches:

> A post-arrest investigatory strip search did not obviously violate the Fourth Amendment on its face in 1999. In addition, in 1999, no applicable cases provided a police officer with fair notice that he must have, at least, a reasonable suspicion to conduct a post-arrest investigatory strip search of an adult and with fair notice that the facts before Officer Stephens were insufficient to make his suspicion reasonable for the search. The law was not settled for what standard applied to post-arrest investigatory strip searches, and Supreme Court precedent was very deferential to post-arrest investigations. *Justice v. Peachtree City*, 961 F.2d 188, 192-93 (11th Cir.1992), could not squarely govern this case: it addressed a strip search of a juvenile arrested for minor offenses (loitering and truancy), and it acknowledged that unique concerns arise with strip searching youngsters. . . .

> *Justice* and *Bell* were the only applicable cases to address strip searches, and they could not squarely govern this case. Both were materially different from this case, and both upheld strip searches.

*Evans*, 407 F.3d at 1282-83 (footnote and citations omitted).  Finally, the court concluded that while no preexisting law squarely governed the facts before it, the unreasonable manner of the strip search was nevertheless obvious under a totality of the circumstances:[27]

> Every objectively reasonable officer would have known that, when conducting a strip search, it is unreasonable to do so in the manner demonstrated by the sum of the facts alleged by Plaintiffs. The totality of the facts alleged here made this violation--on the day of the search--clear from the terms of the Constitution itself: No objectively reasonable policeman could have believed that the degrading and forceful manner of this strip search (especially in the light of the complete lack of circumstances that might have called for immediate action to conduct a search without the time for cool and calm thought about how to proceed) was "reasonable" in the constitutional sense.

*Evans*, 407 F.3d at 1283.

With these cases in the mind, the court now addresses the limited strip searches conducted by Defendant Henderson and considers "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Justice*, 961 F.2d at 192.  At the scene of the initial stop, Defendant Henderson discovered that Plaintiff M.S. had drug paraphernalia in her purse.  The discovery of this evidence is listed on the arrest papers for Plaintiff M.S.  Accordingly, it was not unreasonable for Defendant Henderson to suspect that Plaintiff M.S., or Plaintiff M.D., as a favor to her friend, might try to hide other drug-related evidence on her person.  Also, the strip searches were reasonably limited as to scope and manner as

---

[27]The totality of the circumstances based upon the plaintiffs' version of the facts included the officer's use of a "baton-like object" to hit and probe the plaintiffs anally and elsewhere, his use of demeaning racist language, and his repeated threats about the plaintiffs' going to prison. *Evans*, 407 F.3d at 1276-77.  Obviously, none of those facts are present here.

Plaintiffs were not completely undressed[28] and were conducted by a female officer in a maintenance closet, outside of the presence of any other officers.  Therefore, under a totality of the circumstances, the limited strip searches were constitutional because they were supported by a reasonable suspicion of the existence of drug evidence and were reasonable limited as to the degree in which they implicated Plaintiffs' constitutional rights.

However, even if Defendant Henderson's actions were unconstitutional with respect to the limited strip searches of Plaintiffs, there is no showing that Defendant Henderson had clear and fair warning that her actions violated clearly established law nor or that she obviously acted in an unreasonable manner under the Fourth Amendment.  This is particularly true as the *Evans* decision, which expressly acknowledged the uncertainly of the law in the area of strip searches, was published over three years after the night in which Plaintiffs were taken into custody and searched. Accordingly, qualified immunity protects Defendant Henderson from liability as to the decision to conduct the limited strip searches of Plaintiffs and the manner in which she performed the searches.

### b.      Other Police Officers

Plaintiffs primarily argue that the individual Defendants (other than Henderson) are not protected by qualified immunity because they failed to intervene with respect to Defendant Henderson's allegedly unconstitutional treatment of Plaintiffs.  Under this theory, Plaintiffs fault these officers for allowing Henderson to conduct what they contend were illegal searches (including strip searches) of them.  As noted above, the court has determined that qualified immunity protects Defendant Henderson from any individual liability in this case.  This necessarily means that qualified

---

[28]They were not required to remove their bras or panties and were only required to lift the underside of their bras up to ensure that no contraband would fall from them.

immunity protects her fellow police officers as well.  In other words, because Defendant Henderson did not violate any clearly established law constitutional law, it follows that, under these facts, the other law enforcement officials sued in this case cannot be held liable for failing to prevent her from taking the actions that she did with respect to Plaintiffs.

However, even if the court had decided that some of Defendant Henderson's actions in initially stopping Plaintiffs were not covered by the defense of qualified immunity, the other police officers would still benefit from that defense.  More specifically, qualified immunity protects the other police officers for the alternative reason that there is no evidence in the record that any of them had cause to disbelieve Defendant Henderson's statements – that she initially stopped Plaintiffs for a proper reason.  Nor does the record suggest they had any reason to question any of Defendant Henderson's actions.  Absent some evidence that the other police officers were put on notice of some questionable conduct by Defendant Henderson, the other officers sued by Plaintiffs were under no constitutional duty, much less a clearly established one, to intervene and stop the detention or searches of Plaintiffs.

## C.    City of Homewood

Plaintiffs' claims under § 1983 against the City are governed by the rules established by the Supreme Court in *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  In order for the City to be subjected to § 1983 liability, *Monell* requires that Plaintiffs prove, at a minimum:  (1) that the individual defendants' actions were unconstitutional; and (2) that a municipal "policy" or "custom" of the City caused these violations to occur.  *See, e.g., Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) ("[A] municipality may be held liable [under section 1983] for the actions of a police officer only when municipal 'official policy' causes a constitutional violation.").

As both of these elements must be satisfied for *Monell* municipality liability to exist, the City's potential liability is necessarily contingent upon a determination of the viability of Plaintiffs' claims against the individual defendants.  Because the court has concluded that no underlying violations of Plaintiffs' constitutional rights took place, there can be no municipal liability on the part of the City. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (recognizing that if person suffers no constitutional injury, then no liability may exist against government body); *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996), *cert. denied.*, 522 U.S. 966 (recognizing that "an inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred"); *Hardin v. Hayes*, 52 F.3d 934, 939 n.8 (11th Cir. 1995) (holding that when underlying act at issue is not constitutional violation, there is no need to consider whether municipal policy is deficient).

Moreover, even if Plaintiffs could establish constitutional violations by some or all of the police officers referenced above, the City is entitled to summary judgment for the additional reason of Plaintiffs' failure to present sufficient evidence that the municipality knew of a need to train its officers in particular areas at issue in this case.  In *City of Canton v. Harris*, 489 U.S. 378, 392 (1989), the Court acknowledged that "there can be limited circumstances in which an allegation of a 'failure to train' can be the basis for liability in § 1983," and held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to 'deliberate indifference' to the rights of persons with the police come into contact."  In other words, the deliberate indifference standard requires a conscious choice on the part of a municipality and the individual shortcomings of a police officer or even the negligent administration of an "otherwise sound program" are insufficient grounds for maintaining a § 1983 municipal claim. *City of Canton*,

29

489 U.S. at 390.

At the hearing conducted in this case, the court requested a supplemental filing from Plaintiffs detailing the evidence upon which they relied to support their § 1983 claim for inadequate training against the City.  Plaintiffs filed this evidentiary material on July 6, 2005, and the court has carefully studied its contents.  (Doc. #126).  At most, the deposition testimony relied upon by Plaintiffs suggests mere negligence (*i.e.*, alleged training deficiencies within the City's Police Department).  Nothing contained in the supplemental filing indicates the existence of a preexisting claim or incident, much less a pattern of complaints relating to the City's Police Department's failure to train officers on how to handle juvenile detainees and/or arrestees.

This failure of proof is fatal to Plaintiffs' § 1983 failure to train claim against the City.  As the Eleventh Circuit has made clear, typically, a failure to train claim cannot be predicated and established, much less sustained, by reliance upon a random or isolated incident of alleged misconduct.  *See McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) ("In order for a plaintiff to demonstrate a policy or custom, it is "generally necessary to show a persistent and wide-spread practice.") (internal quotations and citations omitted); *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir.1986) ("Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the municipality.  Normally, random acts or isolated incidents are insufficient to establish a custom or policy.").  Put differently, there is no evidence (much less substantial evidence) in the record of a continued failure by the City "to prevent known constitutional violations by its police force." *Depew*, 787 F.2d at 1499.  Therefore, Plaintiffs have not adduced sufficient evidence of a policy or custom to support municipal liability under § 1983, and summary judgment is proper for the City on Plaintiffs' claims against it.

30

### D.     Remaining State Law Claims

Having concluded that Defendants are entitled to summary judgment on all federal claims, pursuant to 28 U.S.C. § 1367(c)(3), the court, in its discretion, declines to exercise jurisdiction over the remaining state law claims, and will enter an order dismissing them without prejudice.

## VI.     CONCLUSION

Defendants have carried their burden on summary judgment of demonstrating that there are no material facts in dispute and that they are entitled to judgment as a matter of law on Plaintiffs' federal claims.  More specifically, all the individual defendants, including Defendant Henderson, are entitled to the protection of qualified immunity with respect to Plaintiffs' federal claims either because there has been no showing that they committed constitutional violations against Plaintiffs, or alternatively because they did not violate any clearly established law.  The City of Homewood is also entitled to summary judgment on Plaintiffs' § 1983 claim against it due to Plaintiffs' inability to adduce the evidence necessary to sustain an actionable failure to train claim.  The court, in its discretion, declines to exercise jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(c)(3), and will enter an order dismissing those claims without prejudice.

DONE and ORDERED this _____12th_____ day of August, 2005.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

31